# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **RONALD GRANTLAND** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-05-S-2569-NE** |
| | ) | |
| **UNITED STATES MERIT** | ) | |
| **SYSTEMS PROTECTION BOARD,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Ronald Grantland, seeks judicial review of a final decision of the Merit Systems Protection Board, which held that he must be removed from employment with the Alabama Department of Public Health because his candidacy for election to a position on the Alabama Legislature violated the Hatch Political Activities Act (the "Hatch Act" or "the Act"), 5 U.S.C. § 1501 *et seq.*

### PART ONE

### *Legal Framework*

The relevant provisions of the Hatch Act prohibit a "State or local officer or employee" from "be[ing] *a candidate for* elective office," unless the election is entirely non-partisan.  5 U.S.C. §§ 1502(a)(3) (emphasis supplied), 1503.[1]  The term

---

[1] 5 U.S.C. § 1503 states, in full:

"State or local officer or employee" is defined by the statute as "an individual employed by a State or local agency whose principal employment is in connection with an activity which is financed in whole or in part by loans or grants made by the United States or a federal agency . . . ." 5 U.S.C. § 1501(4).  The United States Office of Special Counsel ("Office of Special Counsel" or "OSC") is charged with investigating any potential violations of the Hatch Act and presenting its findings to the Merit Systems Protection Board ("the Board"), which will conduct a hearing to determine if a violation has occurred and what penalty, if any, should be imposed. *See* 5 U.S.C. §§ 1504, 1505.  The Board's decision may be appealed to the United States District Court for the district in which the charged employee resides.  *See* 5 U.S.C. § 1508.  The district court "shall review the entire record including questions of fact and questions of law." *Id.*  The same statutory provision directs the district court to

> affirm the [Board's] determination or order . . . if the court determines that it is in accordance with law.  If the court determines that the determination or order . . . is not in accordance with law, the court shall remand the proceeding to the Board with directions either to make a determination or order determined by the court to be lawful or to take such further proceedings as, in the opinion of the court, the law requires.

---

Section 1502(a)(3) of this title does not prohibit any State or local officer or employee from being a candidate in any election if none of the candidates is to be nominated or elected at such election as representing a party any of whose candidates for Presidential elector received votes in the last preceding election at which Presidential electors were selected.

*Id.*

## PART TWO

### *Procedural History*

The Office of Special Counsel filed an administrative Complaint for Disciplinary Action against plaintiff and the Alabama Department of Public Health on May 3, 2004, charging that plaintiff violated 5 U.S.C. § 1502(a)(3) by becoming a candidate in a partisan election, and that the violation warranted plaintiff's removal from his job.[2] Plaintiff filed an Answer to the Complaint on June 28, 2004, stating that he did not intend to violate the Hatch Act, and arguing that no penalty should be imposed.[3] The Alabama Department of Public Health also answered the administrative Complaint, asserting that plaintiff should not be removed from his job.[4] Hearings were held before Administrative Law Judge ("ALJ") Bruce Rosenstein on October 19 and November 24, 2004.[5] Judge Rosenstein issued an Initial Decision on February 22, 2005, granting the OSC's request for disciplinary action and ordering that plaintiff be removed from his employment within thirty days.[6] The ALJ also cautioned that, if plaintiff was not removed within thirty days, the Department would

---

[2]Doc. no. 17 (Joint Appendix), at 154-57.

[3]*Id.* at 160-67.

[4]*Id.* at 158-59.

[5]*See id.* at 51, 126.

[6]*Id.* at 5-19.

be required to forfeit an amount equal to two years of plaintiff's pay out of the federal loans and grants received by the Department.[7]  Plaintiff petitioned the Merit Systems Protection Board for review of the ALJ's decision, and the Board denied his petition. The Board also informed plaintiff of his right to file a petition for review in an appropriate United States District Court within thirty days.[8]  This suit followed.

### PART THREE

*Summary of the Administrative Record*

Plaintiff, Ronald Grantland, has been employed with the Alabama Department

---

[7]*Id.* at 14.  5 U.S.C. § 1506(a) states:

When the Merit Systems Protection Board finds —

(1) that a State or local officer or employee has not been removed from his office or employment within 30 days after notice of a determination by the Board that he has violated section 1502 of this title and that the violation warrants removal; or

(2) that the State or local officer or employee has been removed and has been appointed within 18 months after his removal to an office or employment in the same State in a State or local agency which does not receive loans or grants from a Federal agency;

the Board shall make and certify to the appropriate Federal agency an order requiring that agency to withhold from its loans or grants to the State or local agency to which notice was given an amount equal to 2 years' pay at the rate the officer or employee was receiving at the time of the violation.  When the State or local agency to which appointment within 18 months after removal has been made is one that receives loans or grants from a Federal agency, the Board order shall direct that the withholding be made from that State or local agency.

[8]Joint Appendix, at 1-3.

of Public Health ("the Department") in various capacities since 1973.[9]  Since 2000, he has served as the Administrator of Public Health for the Department's "Area Two," which encompasses seven county health departments in north-central Alabama.[10]  In that position, plaintiff manages the area budget and the budgets of the county health departments within the area, and he supervises personnel in each department.[11]  Plaintiff has consistently received positive performance reviews,[12] and Dr. Donald Williamson — the current Director of the Department — characterized plaintiff's job performance as "exemplary."[13]

The Department received funds under two federal grants during the years 2002 and 2003, and it distributed part of those funds to Area 2.[14]

Plaintiff began to consider running for a seat in the Alabama House of Representatives in 1997.[15]  He sent a letter to his immediate supervisor in April of 1997, disclosing his potential plans.  The closing line of that letter stated:  "Please call me if you should have concerns or questions as it relates to this matter."[16]  In

---

[9]*Id.* at 95-96.

[10]*Id.* at 94, 168.

[11]*Id.* at 95, 169.

[12]*Id.* at 22-30, 42-43, 49-50.

[13]*Id.* at 62.

[14]*Id.* at 169.

[15]*Id.* at 99-100.

[16]*Id.* at 20.

January of 1998, he again wrote his supervisor, this time stating that his plans to seek a seat in the Alabama Legislature were official.  Plaintiff again closed his letter by asking the supervisor to call if he had any concerns or questions.[17]  Plaintiff did not receive a response to either letter.[18]  Plaintiff subsequently ran on the Democratic ticket in the 1998 general election, and he won the seat as representative from District 9 in the Alabama House of Representatives.[19]  Plaintiff testified that he was unaware of the Hatch Act during the 1998 election.[20]

Plaintiff decided to seek re-election in 2001.[21]  Plaintiff mentioned his intentions to Dr. Williamson, but he could not recall Dr. Williamson's response, except that it was not negative.[22]

A representative from Dr. Williamson's office contacted plaintiff in early April of 2002, and informed him that a complaint had been filed against him, as well as against some other Department employees, for potential violations of the Hatch Act.[23] This representative directed plaintiff to meet with John Wible, the Department's

---

[17]*Id.* at 21.

[18]*Id.* at 101-02.

[19]*Id.* at 101, 170.

[20]*Id.* at 102-03.

[21]*Id.* at 103

[22]*Id.*

[23]*Id.* at 103.

General Counsel, to discuss the matter further.[24]  Plaintiff met with Mr. Wible and Ashley Hamlett, the Deputy General Counsel, approximately one week later.[25] Plaintiff, Wible, and Hamlett presented three slightly different versions of what occurred in this meeting.

Plaintiff testified that Wible informed him that an allegation had been made against him and some other employees that might affect their jobs with the Department because of their elected positions.  Wible also informed plaintiff that he and Hamlett "were in the process of getting information concerning these allegations and the Hatch Act and that he would keep [plaintiff] informed."[26]  According to plaintiff, neither Wible nor Hamlett definitively informed him that he was in violation of the Hatch Act, either during their April 2002 meeting, or at any subsequent time.[27]

Wible had a different recollection.  He testified that, during the meeting, he told plaintiff that:

> we had done some research on the Hatch Act and that while, earlier, we thought the Hatch Act applied only to federal employees, there are circumstances it can apply to state employees if they run for partisan election and have this nexus with the [federal] funds; we believe that there's a question about his status in regard to that, and we would need

---

[24]*Id.* at 104.

[25]*Id.* at 103-04.

[26]*Id.* at 104.

[27]*Id.* at 104.

further interpretation of this by the government.[28]

Wible also informed plaintiff of the penalty for a Hatch Act violation:  *i.e.,* "if there is an adverse determination, that you have to either be terminated or the agency, I believe, has to pay two years' salary or something like that or forfeit grants."[29] Nevertheless, Wible did not definitively tell plaintiff that he was covered by the Hatch Act.[30]  Instead, the "impression [Wible] took away from the meeting was that we would turn this over to the Office of Special [Counsel] and I would kind of leave it at that."[31]  After the meeting, Wible had some further contact with plaintiff in an effort to gather information to present to the Office of Special Counsel.[32]  However, Wible did not recall promising plaintiff that he would get back to him with the results of any research Wible might do regarding the potential Hatch Act violation.[33]

Ashley Hamlett testified that she first learned about the Hatch Act from the General Counsel of the State Personnel Department, who called her to discuss a complaint concerning plaintiff's elective position received by the Personnel Department.[34]  Hamlett researched the Hatch Act, and concluded that "it seemed like"

[28]*Id.* at 78.

[29]*Id.* at 76a.

[30]*Id.* at 70.

[31]*Id.* at 71.

[32]*Id.* at 72.

[33]*Id.* at 78.

[34]*Id.* at 131.

it applied to plaintiff's political activities.[35]  Even so, Hamlett felt that the "final decision" about whether the Hatch Act applied to plaintiff did not rest with her or Wible, but with the Office of SpecialCounsel.[36]  When Hamlett and Wible met with plaintiff, therefore, they informed him that the Hatch Act "seemed" to apply to his situation, but that the Department "wouldn't be taking any action concerning [plaintiff's] employment at that time."[37]  Hamlett informed plaintiff that the Department had an affirmative duty to report potential Hatch Act violations to the Office of Special Counsel, so she would be reporting his situation.[38]  Hamlett could not recall whether she and Wible discussed possible penalties under the Hatch Act with plaintiff, but she did "remember telling [plaintiff] he would have to make a decision *before he ran for office again*."[39]  Hamlett also testified that plaintiff stated, during the April 2002 meeting, that he had consulted with two attorneys about the potential Hatch Act violation — Mac McArthur with the Alabama Employees Association, and Joe Espy, an attorney in private practice in Montgomery, Alabama.[40]  Plaintiff later checked in with Hamlett's office to learn whether there had been any

---

[35]*Id.* at 133.

[36]*Id.* at 133-34.

[37]*Id.* at 135.

[38]*Id.* at 135-36.

[39]*Id.* at 136, 143 (emphasis supplied).

[40]*Id.* at 142-43.

response from the Office of Special Counsel.[41]

Hamlett later scheduled, at an unspecified date, a meeting with central office staff and area administrators to discuss the Hatch Act and to distribute a handout explaining the Hatch Act's limitations. Hamlett could not recall whether plaintiff was present at this meeting, but plaintiff testified that he did not attend, and he had never seen the minutes of the meeting.[42]

Hamlett mailed a letter to Karen Dalheim at the Office of Special Counsel on April 16, 2002. The relevant portions of that letter stated:

> Thank you for talking with me last week regarding the Hatch Act and its application to employees of the Alabama Department of Public Health. Pursuant to your instructions, we are bringing to your attention four situations that may conflict with the Hatch Act.
>
> We have two area administrators who have run for public office in partisan elections. As I explained when we talked on the phone, the state is divided into public health areas, and an area administrator oversees the operation of the county health departments in the area . . . . Ron Grantland, administrator for Public Health Area Two, was elected to serve in the State Legislature in 1998 and is running for re-election. . . . .
>
> The public health areas receive federal, state and local funds. However, [the area administrators do not] have discretion about how much federal funding their areas receive. As area administrators, they manage the state and federal programs within their areas. . . . Federal funds are received by the Department and federal funds are then

---

[41]*Id.* at 144.

[42]*Id.* at 114, 134-35.

allocated to central office, counties and areas.  All state, county and area budgets require approval of the ADPH Finance Office and the State Health Officer.

. . . .

As we discussed on the phone, neither the Agency nor the employees were aware of the application of the Hatch Act, and if we had known about the Act, we would have advised them of the possible conflict between the Act and their running for office.  All the above employees are long-term, exemplary employees, and in our view, it would not be in the best interests of the Department or the State for their employment to be adversely affected.  After learning about the Act, we informed all of our bureau directors and area and county administrators about the Act and provided them with the Office of Special Counsel fact sheet regarding the Act for distribution to their employees.

Thank you for your attention to this matter.  If further action is required by this Department or if you have any questions, please do not hesitate to contact me . . . .[43]

Hamlett copied plaintiff on this letter,[44] and plaintiff acknowledged receiving the copy.[45]  However, he testified that he never received a copy of the Office of Special Counsel fact sheet referenced in Hamlett's letter.[46]

Shortly after the meeting with Wible and Hamlett, plaintiff discussed his situation with Ken Guin, an attorney who then occupied the position of majority leader of the Alabama House of Representatives.  Plaintiff testified he sought Guin's

---

[43]*Id.* at 31-32.

[44]*Id.* at 32.

[45]*Id.* at 106.

[46]*Id.* at 107-08.

advice because Guin was in "a very prominent position" within the state legislature. Plaintiff told Guin a complaint had been filed against him under the Hatch Act, and he asked Guin what he knew about the Act. Guin told plaintiff the Hatch Act applied only to federal employees, and it did not apply to state employees.[47]

Plaintiff also discussed the situation with Mac McArthur, an attorney who served, at the time, as the Director of the Alabama State Employees Association, and who had previously served as Director of the Alabama Ethics Commission.[48] McArthur testified that, in his post on the Alabama Ethics Commission, he was responsible for issuing advisory opinions to state and local officials about potential conflicts of interest, and for investigating ethics complaints.[49]  McArthur described the Alabama State Employees Association as a

> group of state employees who came together to protect and promote the interests of state employees.  We lobby for state employees' benefits. We represent employees in employment actions.  We have a broad range of benefits from five lawyers, including myself, on staff to advise state employees, to represent them in the legislature, to being the spokesperson or voice for state employees.[50]

Plaintiff believed that McArthur could assist him because he held "leadership positions that affect the lives of state employees, and the Ethics Commission oversees

---

[47]*Id.* at 109-10.

[48]*Id.* at 110.

[49]*Id.* at 83.

[50]*Id.* at 84.

the employees' activity, so I thought he might know something about the Hatch Act."[51]

Plaintiff and McArthur talked twice during April of 2002, for approximately ten to fifteen minutes each time.[52]  During the first discussion, plaintiff told McArthur a complaint had been filed against him under the Hatch Act, and asked McArthur if he knew how the Act might relate to his position.  McArthur "emphatically said [the Hatch Act] did not apply to state employees; it only applied to federal employees."[53]  Approximately one week later, plaintiff told McArthur that he had spoken to Ken Guin and the "chairman of the judiciary" about the situation, both of whom also had advised plaintiff that the Hatch Act would not apply to him.[54]  McArthur reiterated his opinion, stating, "Ron, I don't see how it could possibly apply to you."[55]  McArthur also shared with plaintiff a recent decision of the Alabama Ethics Commission which held that a state or education employee was not prohibited from serving in the state legislature.[56]  That decision, however, did not mention the Hatch Act.[57]  McArthur acknowledged that he did not perform any independent research

---

[51]*Id.* at 111.

[52]*Id.* at 88.

[53]*Id.*

[54]*Id.* at 86.

[55]*Id.*

[56]*Id.* at 87.

[57]*See id.* at 33-41.

about the Hatch Act, either before or after his conversations with plaintiff, and that he had not read the provisions of the Act that apply to state and local employees.[58] McArthur also acknowledged that plaintiff had not attempted to retain him as his private attorney.[59] Even so, McArthur testified that the ability to seek guidance and advice from counsel at the Alabama State Employees Association is a benefit of membership in the Association, and members are not required to privately retain any of the Association's attorneys in order to receive their legal advice.[60]

After his discussions with Guin and McArthur, plaintiff came to the understanding that the Hatch Act did not apply to state employees. He did not consult any other attorneys because he felt the advice of Guin and McArthur was sufficient, and because he expected the Department's attorneys to get back in touch with him after they had gathered additional information.[61] Plaintiff had no further direct contact with the Office of Special Counsel, or with anyone from the Department, between April 2002 and November 2002, the date of the next general election.[62] Specifically, no one from the Office of Special Counsel, or from the Alabama Department of Public Health, advised plaintiff that, if he continued to seek re-

---

[58]*Id.* at 89-90.

[59]*Id.* at 88.

[60]*Id.* at 91-92.

[61]*Id.* at 111-12.

[62]*Id.* at 112-13.

election, he would be in violation of the Hatch Act.[63]  Plaintiff ran for re-election on the Democratic ticket in the November 2002 general election, and he was reelected to office.[64]

Plaintiff received a telephone call from Nathaniel Bright with the Office of Special Counsel in March of 2003.  Mr. Bright informed plaintiff he needed to address several questions to a representative from the Department, and plaintiff directed him to Ed Davidson, the chief financial officer at the Department.[65]  Plaintiff retained his own independent counsel, Joe Espy, immediately after this telephone call.[66]  A representative from the Office of Special Counsel interviewed plaintiff in September 2003.[67]  Plaintiff testified that he first became aware that the OSC had concluded that his political candidacy violated the Hatch Act in May of 2004, when the OSC filed its complaint with the Merit Systems Protection Board.[68]

## PART FOUR

### *Discussion and Review of the Administrative Decision*

The Sixth Circuit Court of Appeals described a framework for evaluating a

---

[63]*Id.* at 114-15.

[64]*Id.* at 112.

[65]*Id.* at 113-14.

[66]*Id.* at 115, 152.

[67]*Id.* at 114-15.

[68]*Id.* at 115.

decision by the Merit Systems Protection Board in a Hatch Act case as follows:

> The Merit Systems Protection Board has plenary jurisdiction under 5 U.S.C. § 1505 to determine after a hearing whether a state or local employee has violated the Hatch Act, and "whether the violation warrants the removal of the officer or employee from his office or employment[.]" "The Board's determination may be reversed only when the reviewing court determines that the Board abused its discretion, or that the decision was not in accordance with the law."

*Alexander v. Merit Systems Protection Board,* 165 F.3d 474, 480 (6th Cir. 1999)

(quoting *Minnesota Dep't of Jobs and Training v. Merit Sys. Protection Bd.,* 875 F.2d

179, 182 (8th Cir. 1989) (*en banc*)) (citations omitted) (bracketed alteration in

original).  Additionally, "[o]nce it is shown that a state employee violated the Act, the

only alternatives are removal or no penalty. . . .  The question of whether removal is

warranted is a matter of administrative discretion." *Id.* (citations omitted).

> "As long as there was a reasonable basis for the Board's conclusion that removal was warranted, the district court [is] required to defer to that conclusion as being within the discretion of the Board.  Only if the Board's conclusion had no reasonable basis would it constitute an abuse of discretion."

*Id.* (quoting *Minnesota Dept. of Jobs and Training,* 875 F.2d at 182).

Here, it is undisputed that plaintiff's candidacy for re-election to the Alabama

Legislature in 2002 violated the Hatch Act.[69]  Thus, the only remaining question is

---

[69]*See* doc. no. 13 (plaintiff's initial brief), at 20 ("There is no dispute in this case that Grantland met the definition of employee under the HA and that he violated the provision of § 1502(a)(3) when he stood for partisan election to the Alabama state legislature.").

whether he is subject to removal from his position with the Alabama Department of

Public Health, or to no penalty at all.[70]

> Whether removal is appropriate depends upon the seriousness of the violation, taking into account all relevant mitigating and aggravating factors. *See Williams v. Merit Sys. Protection Bd.,* 55 F.3d 917, 922 (4th Cir. 1995). Those factors include: (1) the nature of the offense and the extent of the employee's participation; (2) the employee's motive and intent; (3) whether the employee received the advice of counsel regarding the activities at issue; (4) whether the employee ceased the activities at issue; (5) the employee's past employment record; and (6) the political coloring of the employee's actions. *See Special Counsel v. Purnell,* 37 M.S.P.R. 184, 200 (1988), *aff'd sub nom. Fela v. Merit Sys. Protection Bd.,* 730 F. Supp. 779 (N.D. Ohio 1980).

*Alexander,* 165 F.3d at 483.

The only factor that clearly weighs in plaintiff's favor is his excellent

employment record with the Department. Several of the other factors clearly weigh

*against* plaintiff. For example, "candidacy in a partisan election is a substantial and

conspicuous violation of the Hatch Act, which has clear political coloring."

*Alexander,* 165 F.3d at 483. *See also Williams,* 55 F.3d at 920 ("Partisan candidacy

by a covered employee . . . is a *per se* violation of the Hatch Act.") (citing *Special*

*Counsel v. Brodnyk,* 42 M.S.P.R. 333, 337 (1989); 5 U.S.C. § 1502(a)(3)) (emphasis

in original). Additionally, it appears from the record that plaintiff has not ceased his

political activity.

---

[70]*See* doc. no. 16 (plaintiff's reply brief), at 2 ("[A]ll parties agree that the ultimate decision is whether Grantland should be removed or receive no penalty at all . . . .").

The remaining factors — plaintiff's motive and intent, and the advice of counsel — require more careful consideration.  Plaintiff argues that these factors weigh in his favor.  First, he asserts that he should receive no penalty for his Hatch Act violation because he sought the advice of counsel before deciding to run in the 2002 election.  It is true that plaintiff discussed his situation with at least two attorneys — Ken Guin and Mac McArthur — who erroneously informed him that the Hatch Act did not apply to state employees.  In this case, plaintiff does not argue that the advice he received from Guin should be considered a mitigating factor.  Instead, he focuses on the attorney-client relationship that, he believes, existed between him and McArthur, and so will the court.

The ALJ held that the advice plaintiff received from Guin and McArthur did not mitigate against his receipt of a penalty, emphasizing the fact that plaintiff "did not retain Guin or McArthur as his personal attorney to represent him in defending the Hatch Act allegation."[71]   The court agrees with plaintiff that he was not necessarily required to separately retain McArthur as his personal attorney, or even to pay him a fee, for McArthur to be considered his counsel.  The Merit Systems Protection Board has held that "[t]he cardinal point in establishing an attorney-client relationship is the client's belief that he is consulting a lawyer in that capacity and

---

[71]Joint Appendix, at 12.

that it is his intention to seek professional legal advice." *Carson v. Department of Energy,* 86 M.S.P.R. 192, 199 (2000) (citing *Johnson v. Department of the Interior,* 24 M.S.P.R. 209, 212 (1984)).  McArthur testified that all members of the Alabama State Employees Association, including plaintiff, are entitled to his legal advice as a benefit of membership.  Additionally, plaintiff testified that he sought McArthur's advice *because of* his post at the Alabama State Employee's Association, as well as his prior experience at the Alabama Ethics Commission.  Thus, plaintiff could have reasonably believed that he was consulting McArthur in his capacity as an attorney, with the purpose of obtaining legal advice.

Even so, the question still remains whether it was reasonable for plaintiff to rely on McArthur's advice.  In other words, whether plaintiff acted in good faith in following McArthur's advice that the Hatch Act did not apply to him.  The ALJ found that plaintiff did not act reasonably, stating that McArthur did not do "any research about the Hatch Act and only gave [his] opinion in brief conversations with Grantland, albeit incorrectly, that the Hatch Act only applied to federal but not state employees."[72]  The ALJ also reasoned that "the ethics opinion that was discussed with Grantland did not refer to or involve questions about the Hatch Act.  Rather, it

---

[72]*Id.*

concerned whether an Alabama state employee could serve in the legislature."[73]

Finally, the ALJ noted that

> Grantland possessed conflicting information about the Hatch Act when comparing the advice received from . . . McArthur with that from Wible and Hamlett.  Yet, at no time, [sic] did Grantland attempt to reconcile these differences.  In this regard, Grantland did not seek to meet or talk by telephone with Wible or Hamlett to resolve this conflict, he did not retain counsel to thoroughly research the Hatch Act issue between April and the November 2002 general election nor did he seek an authoritative legal opinion from the Special Counsel.  Under these circumstances, Grantland did not act as a reasonable prudent person.[74]

The court concludes that these findings are in accordance with law and have a reasonable basis in the evidentiary record.

McArthur testified that he engaged in only two fifteen-minute conversations with plaintiff regarding the Hatch Act.  It appears from both plaintiff's and McArthur's testimony that their meetings were not pre-arranged.  Rather, on both occasions, plaintiff simply "ran into" McArthur in the hallways of the building housing the Alabama Legislature.  Despite McArthur's emphatic insistence that the Hatch Act did not apply to plaintiff, McArthur had not conducted independent research regarding the Hatch Act, and he had not even read the provisions of the Act that apply to state and local employees.  The Merit Systems Protection Board has held

---

[73]*Id.*

[74]*Id.* at 13.

that the removal penalty will not be mitigated when a state employee has some knowledge about the Hatch Act, but fails to seek "authoritative advice from counsel knowledgeable about this law." *Special Counsel v. Jakiela,* 57 M.S.P.R. 228, 233 (1993).

Further, plaintiff had received conflicting information about the Hatch Act from other sources. During the same approximate time period that plaintiff talked with McArthur in the hallways of the Alabama legislature, plaintiff also met with Wible and Hamlett, who gave him sufficient information to, at least, *suggest* that his candidacy might violate the Act. Plaintiff also received a copy of Hamlett's April 16, 2002 letter to Karen Dalheim at the OSC, which identified plaintiff's situation as one that might conflict with the Hatch Act. Despite this conflicting information, plaintiff chose to consider McArthur's advice — which was given during two impromptu, fifteen-minute conversations — to be the most reliable assessment of his legal situation.

It would be reasonable to conclude, based on this record, that plaintiff received conflicting legal advice regarding the applicability of the Hatch Act, but that he decided to credit the advice that allowed him to remain in political office. *See Special Counsel v. Mahnke,* 54 M.S.P.R. 13, 18-19 (1992) (mitigation was not warranted when candidate had been warned that his candidacy would violate the Hatch Act, but

did not contact the OSC for definitive advice, and instead contacted local attorneys who had previously advised him that his candidacy was permissible).  For these reasons, plaintiff's reliance on the advice of counsel will not be considered a mitigating factor to prevent the penalty of removal.

Plaintiff also argues that the record does not support the ALJ's decision that he deliberately violated (*i.e.,* had the requisite motive and intent to violate) the Hatch Act.  The court agrees with plaintiff in only one respect.  The ALJ found that plaintiff "persisted in his political candidacy despite oral and written warnings from the Office of Special Counsel and [the Alabama Department of Public Health] that such conduct violated the Hatch Act."[75]  There is no evidence in the record that plaintiff received a direct warning, either from the OSC or from the Department, that his candidacy definitively violated the Hatch Act anytime prior to May 3, 2004, when the OSC filed the administrative complaint against plaintiff.  That fact is of no consequence, however, because the Board has held that "[a] direct warning from the Special Counsel is not a prerequisite to imposing a removal penalty."  *Special Counsel v. Murdock,* 61 M.S.P.R. 403, 406 (1994).  *See also Special Counsel v. Bianchi,* 57 M.S.P.R. 627, 632 (1993); *Jakiela,* 57 M.S.P.R. at 234.[76]

---

[75]*Id.* at 14.

[76]Plaintiff even acknowledges this principle in his brief.  *See* doc. no. 13 (plaintiff's initial brief), at 51 (acknowledging that "failure of notice from the OSC does not, standing alone, mitigate against removal").

Plaintiff did receive notice from other sources that his candidacy *could* violate the Act.  Specifically, plaintiff received a telephone call from the Director of the Department in early April of 2002, informing him that a complaint had been filed against him and other Department employees for potential violations of the Hatch Act.  Approximately one week later, plaintiff met with Wible and Hamlett.  Assuming plaintiff's account of that meeting to be true, plaintiff learned that an allegation had been made against him under the Hatch Act, and that the allegation might affect his job with the Department because of his elected position.[77]  Plaintiff also received a copy of Hamlett's April 16, 2002 letter to the OSC, which clearly identified plaintiff's situation as a possible conflict with the Hatch Act.  In March of 2003, after plaintiff ran for a second term in the legislature, he received a telephone call from an OSC representative, concerning the OSC's investigation against him.  Plaintiff became sufficiently concerned over this telephone call that he immediately hired attorney Joe Espy.   Finally, plaintiff participated in an interview with a representative from the Office of Special Counsel in September of 2003.

Despite all of these indications that a Hatch Act problem could exist, plaintiff

---

[77]Plaintiff devotes seventeen pages of his initial brief to arguing that the ALJ erred in crediting Ashley Hamlett's testimony that it "seemed like" plaintiff's candidacy violated the Hatch Act, and that he would be required to make a decision before he ran in the November 2002 election. *See* doc. no. 13 (plaintiff's initial brief), at 30-46.  The court need not resolve the credibility issue, because, even without considering Hamlett's statements, plaintiff still received information to suggest that his candidacy could violate the Hatch Act.  *See* text accompanying this footnote.

did not request a copy of the OSC Fact Sheet referenced in Hamlett's April 16, 2002 letter, and he did not attempt to independently contact the OSC.  Instead, he waited for Wible or Hamlett, or someone from the OSC, to contact him, and he apparently assumed that, since they had not contacted him prior to the November 2002 election, he did not have to worry about a Hatch Act violation. Plaintiff also relied upon the advice he received from McArthur in deciding to pursue his candidacy despite the potential Hatch Act violation.  As the court has already concluded, however, plaintiff's reliance on the advice of counsel is insufficient, standing alone, to mitigate against his removal from office.[78]

In cases involving similar circumstances, the Board has refused to mitigate the removal penalty.  In *Special Counsel v. Bianchi,* 57 M.S.P.R. 627 (1993), the claimant — who held the position of Deputy Director at his county's Department of Development — mistakenly believed that his candidacy for a position on his town's governing council would not violate the Hatch Act because his salary was not paid directly from federal funds.  *Id.* at 631.  He contended that two memoranda from his employer's Law Department buttressed his mistaken belief. *Id.* at 631-32.  The Board held that no reasonable person would have interpreted the Law Department's memoranda to state that an employee's salary had to be paid directly from federal

---

[78]*See supra,* pages 17-21.

funds in order for the Hatch Act to apply.  *Id.* at 632.  The Board further held as

follows:

> We conclude that Mr. Bianchi acted unreasonably in clinging to
> the notion that he was not covered by the Hatch Act because his salary
> was not paid with federal funds in the face of clear advice to the
> contrary.  We agree with the CALJ's finding that this and the other
> evidence in this case demonstrate that Mr. Bianchi willfully violated the
> Hatch Act.  The record reflects that Mr. Bianchi knew of the Hatch Act.
> He knew that questions had been raised concerning the propriety of his
> political activity and that the matter had been referred to the Special
> Counsel.  He had heard nothing from the Special Counsel or [his
> employer] regarding the investigation.  He knew or should have known
> after reading the Law Department's memoranda that his belief that
> salary source determined Hatch Act coverage was incorrect.  He also
> knew he could obtain authoritative advice on the Hatch Act from the
> Special Counsel.  Yet, Mr. Bianchi threw caution to the wind and
> persisted in his prohibited political activity.  In so doing, Mr. Bianchi
> acted with deliberate disregard of the law.  This is tantamount to an
> intentional violation.

*Id.* (citation omitted).  The Board adhered to this decision despite the fact that the

OSC had not conducted a full investigation prior to Mr. Bianchi's candidacy,

because, before he ran for office, Mr. Bianchi knew that his situation had been

referred to the OSC for an investigation.  *Id.* at 631.

In *Special Counsel v. Murdock,* 61 M.S.P.R. 403 (1994), the Board held that

the removal penalty was warranted when a candidate was aware of the Hatch Act, but

failed to obtain authoritative advice from the OSC before running for office.  *Id.* at

405-06.  More specifically, the Board stated that,

> [w]here an employee receives information about the Act that would
> cause a reasonably prudent person to avoid partisan political activity, the
> employee may not claim that violation of the Act was unknowing and
> unintentional.   Here, Ms. Murdock was warned on at least four
> occasions that her candidacy might be violative of the Hatch Act, yet she
> did not avail herself of the opportunity to obtain advice personally from
> the Office of Special Counsel about the propriety of her candidacy. . . .
> She testified that she had been informed that the Office of Special
> Counsel was a source of information on the Act. . . . Indeed, the record
> shows that she told her supervisor that "[she] had been told that there
> could be problems with the Hatch Act and that she had decided to take
> her chances and run anyway and that there only would be a problem if
> someone made a complaint. . . .   Thus, Ms. Murdock knowingly
> assumed the risk of a Hatch Act violation.  *See State of Minnesota,
> Department of Jobs and Training v. Merit Systems Protection Board,*
> 875 F.2d 179, 183-84 (8th Cir. 1989) (*en banc*).

*Murdock,* 61 M.S.P.R. at 406-07 (bracketed alteration in original).

Similarly, in the present case, plaintiff had knowledge of the Hatch Act as early

as April of 2002, when he was contacted by Dr. Williamson's office about a potential

violation.  Plaintiff knew that questions had been raised about his candidacy, and

even though the OSC's investigation was still ongoing when plaintiff decided to run

for re-election, plaintiff was aware of the OSC's involvement.[79]  On several

occasions, plaintiff received information indicating that his candidacy might violate

---

[79]Plaintiff complains of the OSC's "neglect or inaction" in failing to contact him between April of 2002 and March of 2003.  *See* doc. no. 13 (plaintiff's initial brief), at 50-51.  The court is not impressed with the length of time it took for the OSC to complete, or even to substantially begin, its investigation, especially when Mr. Grantland's Hatch Act violation was so clear.  Nonetheless, the languid pace of the OSC's investigation will not relieve plaintiff of liability for his clear statutory violation, especially considering that prior notice from the OSC is not a necessary prerequisite for imposition of the removal penalty.  *See supra,* pages 21-22.

the Act, but he did not attempt to directly contact the OSC to gain a definitive answer. The ALJ found that a reasonably prudent person would have concluded, based on this information, that continued political candidacy would violate the Act, and that plaintiff had acted with deliberate disregard for the law. These findings were consistent with the Board precedent discussed above, and they had ample support in the evidentiary record.

**PART FIVE**

*Conclusion*

In summary, the only factors that weigh in plaintiff's favor are his exemplary work history, and the consequent loss to the Department if he were required to leave his post. While the court does not question plaintiff's job performance, it is not enough, in light of all the other factors weighing against him, to mitigate the penalty of removal. *See Brondyk,* 42 M.S.P.R. at 338-39 ("[T]he respondent's admirable work record cannot, in light of the circumstances surrounding his violation of the Hatch Act, be a basis for a finding that his removal is not warranted."). Accordingly, the ALJ did not abuse his discretion in deciding that plaintiff should be removed from his post at the Department of Public Health. An order affirming the ALJ's decision will be entered contemporaneously herewith.

DONE this 12th day of June, 2007.

_____
United States District Judge